ISABELLA M. PLUMLEY, Appellee, v. BROTHERHOOD OF AMERICAN YEOMEN, Appellant.

No. 40099.

MARCH 11, 1930.

REHEARING DENIED SEPTEMBER 26, 1930.

*H. W. Pitkin* and *George M. Faul,* for appellant.

*A. D. Pugh,* for appellee.

GRIMM, J.—The plaintiff is the named beneficiary in a certificate of membership issued to the deceased insured, Isabella M. Lewallen, who died on December 30, 1928, at Des Moines, Iowa. The face of the certificate is $1,000. The plaintiff beneficiary is the mother of the insured. The defendant is a fraternal beneficiary association, organized under the laws of the state of Iowa, with its principal place of business at Des Moines, and it is organized not for profit, but for the sole benefit of its members and their beneficiaries. It has a lodge system, ritualistic work, and a representative form of government.

This certificate upon which the suit was brought was issued October 1, 1923, and is No. 190231. It was issued in exchange for a former certificate, and is known as an ''ordinary life certificate.'' As is customary with such institutions, the contract between the insured and the Association is made up of the application, the certificate, and the by-laws. The certificate in this case contains, indorsed upon it, a table of values, under and by virtue of which the parties agreed to the amount of, first, ''paid-up protection;'' second, ''cash withdrawal or loan value;'' and third, ''extended protection,'' available at the end of each year beginning with the third of the life of the certificate. The amounts of each of these three items vary from year to year, depending upon the length of time during which the certificate has been in force. In this particular case, taking into account the various items material thereto under the terms of the contract, there was available to the certificate holder at the end of the fifth year, the following amounts:

(1) ''Paid-up protection,'' $98.

(2) ''Cash withdrawal or loan value,'' $35.

(3) ''Extended protection'' in years and days, 3 years, 362 days.

This entire table was definitely indorsed on the certificate, as a part thereof. The certificate contained the following, in reference to said paid-up protection, cash withdrawal or loan values, and extended protection:

''After the payment of monthly or other payments for three

or more full years, one of the following options shall become effective.''

Then follow five definite options, each specified and determined under a separate heading, as follows:
(1) Automatic paid-up protection.
(2) Cash withdrawal value.
(3) Extended protection.
(4) Automatic monthly payment loans.
(5) Cash loan.

It appears without dispute in this case that the insured elected to take advantage of the option provided in the fifth, or ''cash loan,'' option. The contract in relation thereto provides as follows:

''Upon the due assignment of this certificate and the deposit of the same with the association while it is in full force, the association will loan to the member named herein any amount *within the loan value shown by the adjoined table*: provided, that the association may defer such loan for a period not exceeding 60 days from the date of the application therefor. The association will furnish the form for the required assignment and upon completion of the loan will issue an official receipt for the deposit of the certificate. The loan will bear interest at the rate of six per cent per annum, payable in advance to the end of the current certificate year and annually in advance thereafter.

''The values of the above options when exercised by the member, or on becoming effective at any time during the course of any year, shall be the values for the last completed certificate year prior to the exercise or the operation of such options.

''If there is any indebtedness to the association on account of or secured by this certificate, the loan and cash values will, be reduced by the indebtedness and the amount of the paid-up, or the term of extended protection will be such as may be purchased by the remainder of the cash value applied as a single net premium.'' (Writer's italics.)

It will be noted that this certificate became effective October 1, 1923, and that, five years thereafter, October 1, 1928, the insured had contracted loans on the certificate in the sum of $35, which was the maximum cash withdrawal or loan value

expressly provided for in the contract between the parties. By the express terms of the contract there would be no further cash withdrawal or loan value available to the insured until the end of the sixth year, October 1, 1929, when, under the terms of the contract, the insured would have been entitled to a cash withdrawal or loan value of $48.

After the table hereinbefore referred to, there appears on the contract the following:

"The accumulations maintained upon this form are the usual reserves computed by the American Experience Table of Mortality and 4% interest, and the loan and cash withdrawal values and the values of the paid-up and extended protection are each equal to such reserves, *less a surrender charge of not to exceed one per cent of the face of the certificate.* The first year's protection under this certificate is term protection." (Writer's italics.)

It will be noted from the foregoing that the contract between the parties specifically provided for a surrender charge, to be imposed by the association, in an amount not to exceed one per cent of the face of the certificate, or, in this case, not to exceed $10. The certificate provided that the annual assessment rate should be $20.19, the quarterly rate $5.30, and the monthly rate $1.87, plus Children's Home Fund, 10 cents, Homestead dues, 15 cents, or a total of $2.12 per month.

The insured failed to make the monthly payment for October, 1928, due October 1, 1928, and made no payments thereafter, and by the terms of the contract, she became automatically suspended on the last day of October, 1928. Section 107 of the by-laws then in force provides, among other things, as follows:

"Each and every member who shall fail to pay the regular payment, including his dues, on or before the last day of the month in which the same falls due, * * * shall be *automatically suspended* without any action on the part of any Homestead or any officer or officers of this association and the certificate held by such member shall immediately be null and void and *all payments made thereon shall be forfeited,* notwithstanding any payments made to the local correspondent after the date of such suspension unless the same are made in full compliance

with the by-laws of the association relating to reinstatement of members.'' (Writer's italics.)

It will be noted that this provides an automatic suspension: that is to say, if payment is not made within the time provided, no action is necessary on the part of anyone connected with the association, to complete the suspension. An attempt was made to reinstate.

It appears that the insured died from pneumonia, contracted in connection with confinement. The child was born about a week before the death of the insured. The insured went to the hospital on December 23, 1928, where she remained until her death, just after midnight, December 30, 1928.

On December 29th, there was an attempt by the husband of the insured to make a quarterly payment of assessments on this certificate. The payment was refused, with the statement on behalf of the association that the insured was suspended. A reinstatement blank was procured, and it was filled out and returned to the society on the 29th. It was signed ''Mrs. Isabel Mary Lewallen, Mrs. Oliver Parsons.'' The insured was Mrs. Oliver Parsons, and her maiden name was Isabel Mary Lewallen. The application for reinstatement contains, among other things, the following questions and answers:

''5. Have you now any disease or disorder? If so, explain. No.

''6. Have you had any sickness, injury, or operation since said certificate was issued? No.''

Then followed a renewal of all warranties in the original application, and then the following language:

''If any statement or answer in this or in my original application is not literally true, I agree that the certificate issued on said original application and my reinstatement under this application shall for that reason be null and void, *ab initio.*''

This application for reinstatement did not reach the proper officer of the defendant association until after the death of the insured, and, of course, was not approved, and did not become effective. The by-laws at that time expressly provided that no reinstatement could be had, except if and when the party was in good health. Among other things, the by-laws provided:

"But no reinstatement of a member suspended more than thirty days shall become effective until the written warranty of good health is approved by the medical director, who shall have the right to require such evidence of good health as he deems advisable."

From the foregoing it clearly appears that the insured was in suspension at the time of her death, and that plaintiff can have no recovery whatever on this certificate unless, as is contended by the plaintiff, the defendant society had in its possession money belonging to the insured which it was compelled to apply in carrying the certificate in force on and after the last day of October, 1928, to and including the 30th day of December, 1928, the date of the death of the insured.

I. By-law 107, a large portion of which has been hereinbefore quoted, contains as the closing sentence thereof the following:

"Provided, however, if the certificate of a member which provides for *paid-up* or *extended insurance* on default of payments, after the payment by the member of the required payments for three or more full years, is suspended as herein provided, it shall be continued in force for the amount of the death benefit only and for the period provided by the terms of said certificate in the event of default of payments by the member." (Writer's italics.)

Attention is now called to the fact that this particular portion of the by-law applies to, first, "paid-up protection," and second, "extended protection," and does not apply to "cash withdrawal or loan value;" and it will be recalled that the insured in this case elected to take under Option 5, the cash withdrawal or loan value, rather than paid-up protection or extended protection. After this option was exercised, the certificate held by the insured did not "provide for paid-up or extended insurance," but provided for "cash withdrawal or loan value." The said portion of By-law No. 107 furnishes no assistance to the plaintiff. The certificate was not carried in force by reason thereof. Had the insured elected to take paid-up or extended insurance, instead of cash surrender or loan value, a different question would arise.

II. Apparently it is the contention of the plaintiff that the *reserve* on the certificate, in the possession of the insurance association, must necessarily be applied by the association in  carrying the certificate in force and preventing suspension thereof: that is to say, that the entire reserve on the certificate must be used in the payment of assessments applicable to the certificate holder, and must thus be applied before the certificate can lapse and become forfeited.

The plaintiff produced an insurance actuary as a witness, who testified, in substance, that the reserve on this particular certificate at the end of the fifth year was $45.38 per thousand; and, inasmuch as the loan advance on the certificate amounted to only $35, it is the claim of the plaintiff that there was available in the possession of the association $10.38, with which to carry the certificate without forfeiture. Appropriate and vigorous objections were made to the introduction of this testimony. Assuming, without deciding, that the evidence was properly admitted, we pass to a consideration of the contention of the plaintiff concerning the legal reserve.

The plaintiff refers to the following sections of the Code of 1927, pertaining to fraternal insurance:

"8825. *Valuation of certificates.* The certificate written by any domestic fraternal beneficiary association operating under the provisions of the foregoing mortality table shall be valued in the same manner as provided in Section 8654, except that such valuation shall be based upon the foregoing mortality table and four per cent interest. If the society makes loans on its certificates, the valuation shall be based upon a mortality table not lower than the American table of mortality and four and one-half per cent interest.

"8654. *Valuation of policies.* As soon as practicable after the filing of such statement [annual statement], the commissioner of insurance shall ascertain the net cash value of every policy in force upon the basis of the American table of mortality and four and one-half per cent interest, or actuaries' combined experience table of mortality and four per cent interest, in all companies organized under the laws of this state. For the purpose of making such valuation he may employ a competent

actuary, who shall be paid by the company for which the service is rendered; but the company may make such valuation and it shall be received by the commissioner upon satisfactory proof of its correctness.

"8781. *Certificate permitted.* Any fraternal beneficiary society issuing certificates, based upon rates not lower than those required by the mortality table set forth in Section 8823, may issue certificates providing for death benefits upon the term, whole life, or limited payment plan, in which event it *shall maintain the required legal reserve on all such certificates,* based on the standard adopted for the issuing of such certificates, which said reserve shall be set aside and held as a special reserve fund for the exclusive benefit of the members contributing thereto. (Writer's italics.)

"8782. *Benefits.* Any such society may grant to its members extended and paid-up protection or such withdrawal equities as its constitution and laws may permit, provided that such grants shall in no case exceed in value the portion of the reserve to the credit of the members to whom they are made."

From the foregoing it will be noted that, briefly stated, every certificate of membership issued by the defendant association must be valued in the same manner as policies of life insurance, under the provisions of Section 8654. The funds created by the association can be invested only as provided by law, and the securities are deposited with the commissioner.

In the early days of such associations, no funds were kept on hand with which to pay losses, and assessments were made only as the payment of claims made the same necessary. Step by step, all this was changed, until at length legislatures required by statute, the creation and maintenance, by suitable calls or assessments, of funds at least approximately sufficient to meet all certificates when they mature.

The testimony on behalf of the plaintiff contains the following: "The net cash value as used in the Code in making our valuations is construed to be the same as the legal reserve under the policy." It is the contention of the plaintiff that the net cash value or *legal reserve* which must be deposited in securities by the insurance association with the commissioner of insurance is available to the insured for the purpose of carrying the certificate without lapse or forfeiture.

It will be noted that the law of Iowa contemplates, and the specific contract in this case permits, that the defendant association may loan to the certificate holder a portion of this legal reserve; and apparently it is the position of the plaintiff that, because it is permissible to loan a portion of this legal reserve, the balance, if any of it is not thus loaned, belonged to the insured, and is available for carrying the certificate past forfeiture. In this the plaintiff is in error. In the first place, all loans made are deducted from the face value of the certificate, in the event that the certificate matures. In the second place, this legal reserve is a fund which the law requires shall be created and maintained for the purpose of assuring the proper maturity of certificates as a whole. The law requires that this fund be created in order that, from day to day during the operation of these organizations, there may be accumulated a sufficient amount in the possession of the society with which to pay these certificates as they mature. In a sense, of course, it belongs to the certificate holders. All the assets of a fraternal beneficiary society may be said, in the same sense, to belong to the certificate holders. They are organizations, not for profit, but solely for the benefit of the members and their beneficiaries. It is not true, however, that the individual certificate holder has an individual right in any portion of the legal reserve. No part of it belongs to him individually. The legal reserve on his certificate is not his personal property, nor is it available to him or his beneficiary for any purpose except that for which it was created: to wit, that there may be sufficient funds on hand, if the certificate holder dies in full membership, to pay the face of the certificate.

In these modern days, these fraternal societies, in their competition with old-line insurance companies, have seen fit to arrange for the borrowing by the certificate holder of certain portions of this legal reserve, and charging the same against the face value of the certificate, if the certificate matures. This favor or permission granted to the certificate holder is usually definitely measured and determined in the contract, and so it was in this case. The contract between the parties definitely specified that, at the end of the fifth year of the life of the certificate in question, the certificate holder might borrow $35 from the association, and the certificate holder in this case did so borrow $35. That was the entire extent of the certificate holder's

claim upon the legal reserve. In the first place, the contract definitely provided as follows:

"The accumulations maintained upon this form are the usual reserves computed by the American Experience Table of Mortality and 4% interest, and the loan and cash withdrawal values and the paid-up and extended protection are each equal to such reserves, *less a surrender charge of not to exceed one per cent of the face of the certificate.* The first year's protection under this certificate is term protection." (Writer's italics.)

From the foregoing it will be noted that the entire reserve was divided into two parts: first, cash withdrawal or loan value, and second, a surrender charge not to exceed one per cent of the face value of the certificate, and in case of failure to pay an assessment when due and before forfeiture, as provided in the contract, the society was entitled to a surrender charge out of the legal reserve not to exceed one per cent of the face value of the certificate.

The determining factor, however, in this case is that the defendant society did not have in its possession any funds belonging to the insured in the form of legal reserve on the certificate in question with which to carry the certificate past a forfeiture. And this would have been equally true if no loan had been made by the certificate holder thereon. In other words, no part of the legal reserve was available to the insured to carry the certificate in force. To permit the enforcement of the plaintiff's claim in this regard would be, as a practical proposition, to almost immediately destroy the fund and nullify the requirement that a legal reserve be set up and maintained, in the form of approved securities, in the possession of the insurance commissioner. It follows that, inasmuch as the insured lapsed the certificate on the last day of October, 1928, and was not reinstated in accordance with the terms of the contract, and inasmuch as the society had no funds belonging to and under the control of the insured to be applied in carrying the certificate past the forfeiture, the insured was not a member at the time of her death, and the defendant society is not liable on the contract, and the plaintiff cannot recover. Upon analogy, and in support of this proposition, see *Hoover v. Bankers' Life Assn.,*

155 Iowa 322; *Mulherin v. Bankers' Life Assn.,* 163 Iowa 740; also, see authorities collected in 29 A. L. R. 517.

III. The court had found for the plaintiff and against the defendant as follows:

"The court finds that the defendant had in its hands funds belonging to or that should have been credited to the certificate holder, by way of legal reserve, over and above the loan therefrom, of sufficient amount to have offset or paid the assessments that defendant claims were in default at the time of the death of the certificate holder."

After this finding, the plaintiff filed a motion to correct errors in the judgment entry and record, based upon twelve different grounds, all of which were overruled by the court.

a. It is contended by the plaintiff that, inasmuch as the certificate had been in suspension a few times during the five years of its existence, therefore dues or assessments had been  collected, covering a short time in the aggregate, during which this certificate was not actually in force, and that the money so paid was money in the hands of the defendant society available for carrying this certificate past the forfeiture on the last day of October, 1928. Each time there was a suspension, there followed a reinstatement, upon the by-law terms specified in the contract, which included the payment of all "arrearages." It was within the power of the society to enact such a by-law as a reasonable regulation of its internal affairs. These so-called arrearages were  only a part of a proper charge or assessment against the certificate. This money was paid in for the purpose of creating and maintaining the fund from which matured certificates were paid. No part of it was available to the plaintiff to carry the certificate past a lapse or forfeiture.

b. It is the claim of the plaintiff that unpaid dividends were credits, subject to application as payment of premiums, to prevent a lapse. There is no merit in this contention. The

 dividends were purely voluntary concessions, made to the certificate holder from time to time, based upon the accumulations growing out of the loan and other experiences of the society. The money available for dividends was not money belonging in any sense to the certificate holder so that the same was available to avoid forfeiture. It is claimed that the interest paid in advance on the loan was available to carry the certificate. The interest on the $35 borrowed was paid in advance. It was not money in the hands of the society belonging to the insured, but belonged to the society, as such, and to the membership as a whole.

c. It is contended by the plaintiff that, inasmuch as, at the time of the attempted reinstatement, the quarterly payment passed into the possession of the society, pending approval of  the application for reinstatement, this constituted a waiver of the forfeiture. A sufficient answer to this is that the by-laws provided, in substance, that the receipt of such payments constituted a reinstatement only when made in full compliance with the by-laws of the association relating to reinstatement of members. No reinstatement could take place, except when the insured was in good health. The insured in this case was on her deathbed at the time this money passed to the society. Furthermore, the application did not reach the proper officer of the society until after the insured had died. Subsequently, the money was tendered back.

All the contentions of the plaintiff on her appeal have been carefully examined, and we find no merit in any of them.

It follows that the case on the appeal for the defendant is reversed, and on the appeal of the plaintiff it is affirmed.—*Reversed on defendant's appeal; affirmed on plaintiff's appeal.*

MORLING, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.